## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **JONATHAN DECKER, et al.,** on behalf of themselves and all other similarly situated, | ) ) ) ) | **CASE NO.** |
| | ) | **JUDGE:** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **COLLECTIVE AND CLASS ACTION COMPLAINT** |
| **INEOS PIGMENTS USA INC.** | ) ) ) | |
| | ) | **JURY DEMAND ENDORSED HEREON** |
| Defendant. | ) ) ) | |

Plaintiffs Jonathan Decker and Glenn Painter ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this Collective and Class Action Complaint against Defendant INEOS Pigments USA Inc. ("Defendant"), and state as follows:

### INTRODUCTION

1.      This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs, individually and on behalf of all similarly situated persons employed by Defendant, arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code § 4111 *et seq.,* the Ohio Prompt Pay Act, Ohio Rev. Code § 4113.15, and common law.

2.      Defendant INEOS Pigments USA Inc. is one of the largest producers of titanium dioxide in North America, and the leading producer of titanium chemicals. It operates two plants in

3

*Upon information and belief, Defendant releases employees working the 7:00 a.m. -3:30 p.m. shift to shower at 3:15 p.m.

Ashtabula, Ohio that produce titanium dioxide and titanium chemicals for use in various coatings, plastics, and paper.

3.      Defendant employs employees, including Plaintiffs, to manufacture and produce titanium dioxide and titanium chemicals.

4.      Plaintiffs and similarly situated employees are and were employed in Defendant's two plants located in Ashtabula Ohio: Plant 1, and Plaint 2 North and Plant 2 South.

5.      Due to the hazardous nature of the chemicals and materials contained in Defendant's facilities, Defendant requires Plaintiffs and members of the proposed class wear company-issued protective clothing and safety gear during their work shifts in order to protect them from inhaling or contacting materials in the Defendant's facilities in the air or on surfaces, and to comply with federal and state governmental safety and health regulations and mandates.

6.      The company-issued protective clothing and safety gear includes uniforms (which consist of long pants and long sleeve button-up shirts), steel-toed boots, escape respirators, helmets, CO monitors, safety glasses and goggles, and gloves (hereinafter referred to as "personal protective equipment" or "PPE").

7.      Defendant requires Plaintiffs and similarly situated employees to change into ("don") and change out of ("doff") the PPE before and after their work shifts in designated locations at Defendant's facilities.

8.      Due to the nature of the chemicals in Defendant's facilities, Plaintiffs and similarly situated employees often shower in designated showering areas after their work shifts but before leaving the facility.

9.      The process of donning and doffing the PPE is compensable because Defendant and governmental regulations require Plaintiffs and similarly situated employees to wear the PPE during their work shifts and to don and doff the PPE at the worksite.

2

10.     Additionally, the PPE is an integral and indispensable part of the Plaintiffs' and similarly situated employees' principal work activities, as employees cannot safely or lawfully perform their work requirements without wearing the PPE.

11.     Plaintiffs and similarly situated employees spend substantial amounts of time each day donning and doffing PPE, showering, and walking to and from the locker rooms to the plant floors before and after their work shifts.

12.     Defendant requires Plaintiffs and similarly situated employees to engage in face-to-face relief meetings with the outgoing workers prior to beginning their shift to discuss any issues or problems that are expected for the upcoming shift.

13.     Defendant, however, does not pay Plaintiffs and similarly situated employees for all of this time. Instead, Defendant pays Plaintiffs and similarly situated employees based on their *scheduled* shift start times and end times (e.g. 6 a.m. to 6 p.m., with no paid breaks during the 12-hour shifts, and/or 7 a.m. to 3:30 p.m.*, with a 30 minute lunch break for those working 8-hour shifts), not the time that Plaintiffs and members of the proposed class perform their first and last principal activities of the workday.

14.     Consequently, Defendant does not pay Plaintiffs and similarly situated employees for all compensable time, including overtime.

15.     Defendant requires Plaintiffs and similarly situated employees to don and doff the same or substantially similar PPE; and Defendant compensates Plaintiffs and similarly situated employees in substantially the same manner.

16.     The individuals Plaintiffs seek to represent in this action are current and former employees who work(ed) for Defendant at their facilities and who are/were required to don and doff protective clothing and safety gear before the start of and after the end of their work shifts.

3

*Upon information and belief, Defendant releases employees working the 7:00 a.m. -3:30 p.m. shift to shower at 3:15 p.m.

17.     Defendant knew or could have easily determined how long it takes Plaintiffs and similarly situated employees to complete their donning, doffing, walking, meeting and showering activities, and Defendant could have properly compensated Plaintiffs and members of the proposed collective/class members for this pre- and post-shift work, but deliberately chose not to.

18.     Plaintiffs seek a declaration that their rights, and the rights of the putative collective/class members were violated, an award of unpaid wages, an award of liquidated damages, injunctive and declaratory relief, attendant penalties, and an award of attorneys' fees and costs to make them whole for damages they suffered, and to ensure that they and future workers will not be subjected by Defendant to such illegal conduct in the future.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction of this action under 28 U.S.C. § 1331 because Plaintiffs' claim raises a federal question under 29 U.S.C. § 201 *et seq.*

20.     Additionally, this Court has jurisdiction over Plaintiffs' FLSA claim under 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

21.     Moreover, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 class members, and at least some class members have different citizenship than Defendant.

22.     Defendant's annual sales exceed $500,000, and Defendant has more than two employees; thus, the FLSA applies in this case on an enterprise basis. Defendant's employees, including Plaintiffs, engage in interstate commerce in the production of goods for commerce; therefore, they are also covered by the FLSA on an individual basis.

4

23.     This Court has supplemental jurisdiction over Plaintiffs', and the Class's, state law causes of action against Defendant pursuant to 28 U.S.C. § 1367(a), which provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

24.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

25.     This Court has personal jurisdiction over Defendant because Defendant is incorporated in Delaware and maintains its principal place of business in the state of Ohio.

26.     Venue is proper in the Northern District of Ohio under 28 U.S.C. §§ (b)(1) and (2) because Defendant resides in this District and employs Plaintiffs and members of the putative class/collective in this District.

## **PARTIES**

27.     Plaintiff Jonathan Decker is an Ohio resident who has worked for Defendant, and its predecessors, as a shift worker at Defendant's Plant 2 in Ashtabula, Ohio since 2005. Defendant pays Plaintiff Decker $40.85 per hour, plus shift premium pay, nondiscretionary incentive compensation, overtime and vacation pay. Throughout his employment with Defendant, Plaintiff Decker has typically worked 40 hours or more per work and has worked overtime during numerous workweeks, in line with Defendant's mandatory overtime policies. Plaintiff Decker signed a consent form to join this collective action lawsuit. **Ex. A.**

28.     Plaintiff Glenn Painter is an Ohio resident who has worked for Defendant, and its predecessors, as a maintenance worker at Defendant's Plant 2 in Ashtabula, Ohio since 1996. Defendant pays Plaintiff Painter $38.37 per hour, plus shift premium pay, nondiscretionary incentive

compensation, overtime and vacation pay. Throughout his employment with Defendant, Plaintiff Painter has typically worked 40 hours or more per work and has worked overtime during numerous workweeks, in line with Defendant's mandatory overtime policies. Plaintiff Painter signed a consent form to join this collective action lawsuit. **Ex. B.**

29. Defendant INEOS Pigments USA Inc. is a Delaware corporation with its principal production plants located at 2426 Middle Rd, Ashtabula, OH 44004. Its registered agent for service of process is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219.

## GENERAL ALLEGATIONS

### A.        Defendant's Operations and Manufacturing Facilities

30. INEOS Pigments is one of the largest titanium dioxide producers in North America and the leading producer of titanium chemicals. The Company is estimated to have an annual revenue of $15 million and employs approximately 135 people.

31. INEOS Pigments is owned by its parent company, INEOS USA, LLC, which owns 36 businesses that produce a variety of products relating to and used in oil & gas, chemicals and polymers.

32. INEOS Pigments produces two categories of products: (1) Titanium dioxide products, which provide optical and appearance attributes for a variety of applications like coatings, plastics, and paper; and (2) Titanium chemical products [titanium tetrachloride and titanium oxychloride] designed for the metals, catalysts, and specialty materials markets.

33. INEOS Pigments' products are sold throughout North America and around the world. The Company has a corporate headquarters in Baltimore, Maryland. The Company's main production plants are in Ashtabula Ohio.

34. Plaintiffs and similarly situated employees are and were employed in INEOS

6

Pigments' manufacturing facilities in Ashtabula Ohio.

**B.** **Defendant Requires Plaintiffs and Similarly Situated Employees to Utilize Company-Issued PPE during their Work Shifts in Order to Protect the Employees from the Harmful Effects of Chemicals In Use**

35.     Due to the hazardous nature of their operations, Defendant requires Plaintiffs and similarly situated employees to utilize company-issued protective clothing and safety gear during their work shifts in order to protect Plaintiffs and similarly situated employees from inhaling or contacting chemicals in the air or on surfaces and to comply with federal and state governmental safety and health regulations and mandates.

36.     The company-issued protective clothing and safety gear (PPE) includes uniforms (which consist of long pants and long sleeve button-up shirts), steel-toed boots, escape respirators, helmets, CO monitors, safety glasses and goggles, and gloves.

37.     Defendant requires Plaintiffs and similarly situated employees to don and doff the PPE before and after their work shifts in designated locations at Defendant's manufacturing facilities.

38.     Defendant prohibits Plaintiffs and similarly situated employees from donning or doffing the PPE at home.

39.     Defendant also prohibits Plaintiffs and similarly situated employees from taking the PPE home with them or otherwise removing the PPE from Defendant's facilities.

40.     Defendant furnishes Plaintiffs and similarly situated employees with freshly laundered protective clothing each workday.

41.      Defendant prohibits Plaintiffs and similarly situated employees from leaving the locker room and walking to the production area without wearing their PPE.

42.     Defendant prohibits Plaintiffs and similarly situated employees from leaving the

production area and walking back to the locker room without wearing their PPE.

43.     In addition to requiring Plaintiffs and similarly situated employees to don and doff PPE before and after their work shifts in designated locations, Plaintiffs and similarly situated employees often shower in their designated locker room areas after their work shift but before leaving the facility in order to decontaminate from the chemicals used during their shifts.

44.     Defendant prohibits Plaintiffs and similarly situated employees from leaving the manufacturing facility without doffing the PPE and changing into a clean pair of clothes.

45.     Plaintiffs and similarly situated employees spend substantial amounts of time each day donning and doffing PPE and walking to and from the locker room and the production area before and after their work shifts and showering after their work shifts.

46.     Defendant also requires Plaintiffs and similarly situated employees to engage in a face-to-face meeting with the outgoing shift or maintenance worker that they are replacing. This meeting takes place after Plaintiffs and similarly situated employees have donned their PPE and before the exiting employee has doffed their PPE.

47.     Defendant does not pay Plaintiffs and similarly situated employees for all of this time.

48.     Instead, Defendant pays Plaintiffs and similarly situated employees based on their *scheduled* shift start times and end times (e.g. 6 a.m. to 6 p.m. or 7 a.m. to 3:30 p. m.), not the time that Plaintiffs and similarly situated employees perform their first and last principal activities of the workday.

49.     Consequently, Defendant does not pay Plaintiffs and similarly situated employees for all compensable time, including overtime.

C.      **Pre-Shift Donning and Walking Activities**

50.     Before their scheduled shifts and before beginning their production and maintenance activities, Plaintiffs and similarly situated employees are required to undertake the following essential work tasks in chronological order:

- Upon arriving at the facility, Plaintiffs and similarly situated employees must swipe their key card at a security gate, walk through a turnstile, and enter the facility.

- After entering the facility, employees must walk approximately 20 yards to the locker room and retrieve their freshly-laundered, company-supplied uniform from lockers in or near the locker rooms;

- After retrieving their protective clothing, employees remove their personal clothing and shoes and stow the items in their locker, and then put on their uniform and boots;

- After putting on their uniform, employees must take other PPE, including hard hat, CO monitor, respirator, and safety glasses and goggles, and gloves, and walk to the control room which is approximately 50 yards from the locker room;

- On the way to the control room, employees must put their lunch items into the lunchroom for their designated area and continue-on to the control room and/or production area;

- Prior to entering the production area, employees must don all other PPE;

- After walking to the production area, employees must find the worker they are relieving and have a face-to-face meeting to discuss instructions for the day and any issues anticipated for the incoming employee's shift.

51.     The pre-shift donning and walking process at the Ashtabula plants takes substantial time on a daily basis, ranging from 15 to 30 minutes per shift.

52.     Plaintiffs and similarly situated employees are not properly paid for this time because Defendant requires Plaintiffs and similarly situated employees to report to their work stations and relieve the person whose shift they are taking-over at the twelve hour mark (i.e. at 6 a.m. or 6 p.m.), or prior to the start of their shift if working an 8-hour shift (i.e. 7 a.m.). This means that Plaintiffs and similarly situated employees must arrive to work approximately 15 to 30 minutes *before* the start

9

of their scheduled shifts in order to complete their pre-shift donning, walking and meeting activities.

53.     Consequently, Plaintiffs and similarly situated employees perform pre-shift work in the range of 15-30 minutes per shift.

**D.    Post-Shift Walking, Doffing, and Showering Activities**

54.      After completing their work assignments for the entirety of their shift, Plaintiffs and similarly situated employees are required to undertake the following essential work tasks in chronological order:

- Employees must find the worker that is relieving them and have a face-to-face meeting to discuss instructions for the day and any issues anticipated for the incoming employee's shift;

- After completing the face-to-face meeting, employees leave the production area and walk approximately 50 yards to the locker room;

- After entering the locker room, employees must remove their PPE, including their hard hat, gloves and goggles, escape respirator, boots, and place it back into the PPE locker;

- Next, employees remove their worn uniform and put it in the laundry receptacle and take a shower in the locker room;

- Then, employees re-dress in their clean street clothes and shoes;

- After changing into their clothes, employees leave the locker room and walk approximately 20 yards to the turnstile where they swipe out and enter the parking lot.

55.     The post-shift walking, doffing, and showering process at the Ashtabula plants takes substantial time on a daily basis, ranging from 15 to 30 minutes per shift.

56.     Plaintiffs and similarly situated employees are not properly paid for this time because Defendant does not permit Plaintiffs and similarly situated employees to leave the production area until they are relieved by the incoming shift-worker and complete a face-to-face meeting, meaning that Plaintiffs and similarly situated employees perform post-shift work in the range of 15-30

minutes per shift.

**E.** **Defendant's Timekeeping System Fails to Properly Account for Plaintiffs' and Similarly Situated Employees' Donning, Doffing, Walking, Meeting and Showering Activities**

57.     Prior to their shifts, Plaintiffs and similarly situated employees are required to swipe into Defendant's time-keeping system; however, Plaintiffs and similarly situated employees are not paid based on their time-spent working. Instead, Defendant provides Plaintiffs and similarly situated employees with pre-filled timesheets designating 12-hours shifts (i.e. 6 a.m. to 6 p.m. or 7 a.m. to 3:30 p.m.), and only pays Plaintiffs and similarly situated employees for 12 or 8 hours of time, not the time that Plaintiffs and similarly situated employees perform their first and last principal activities of the workday.

58.     Defendant requires Plaintiffs and similarly situated employees to report to their workstations and relieve the out-going shift worker with a face-to-face meeting all before the start of their shift; and Defendant does not permit Plaintiffs and similarly situated employees to leave the production area prior to being relieved and engaging in a face-to-face meeting at the end of their shift before going to take a shower and change clothes.

59.     However, as described above, it takes Plaintiffs and similarly situated employees between 30-60 minutes to complete their donning, doffing, walking, meeting and showering activities.

60.     Consequently, Defendants' timekeeping system fails to account for all of the time Plaintiffs and similarly situated employees spend donning and doffing PPE, walking to and from the locker room and production area, participating in a relief meeting, and showering.

**F.**     **Donning and Doffing PPE at the Worksite are Principal Work Activities and are Compensable under the FLSA**

61.     Defendants require Plaintiffs and similarly situated employees to wear the PPE during their work shifts to prevent exposure to harmful chemicals and other toxins, and to comply with federal and state governmental safety and health regulations and mandates.

62.     Additionally, the PPE is an integral and indispensable part of Plaintiffs' and similarly situated employees' principal work activities, as Plaintiffs and similarly situated employees cannot safely or lawfully perform their production activities without wearing the PPE.

63.     Donning and doffing protective clothing and safety gear are principal activities under the Portal-to-Portal Act, 29 U.S.C. § 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the FLSA.

64.     The determination of whether donning and doffing a safety uniform is compensable begins with *Steiner v. Mitchell*, 350 U.S. 247 (1956), the seminal case on the subject. In Steiner, the Supreme Court held that donning and doffing uniforms was compensable when employees handling dangerous chemicals in a wet storage battery factory were "compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employer to provide." *Id.* at 248.

65.     The factory workers in *Steiner* were exposed to high levels of lead particles (dust and fumes), which "permeate[d] the entire plant and everything and everyone in it." *Id.* at 249. Lead dust attached to the skin, hair, clothing and shoes of the employees, and presented significant risks to family members of the workers because toxic particles could be "brought home in the workers'

clothing or shoes." *Id.* at 250.

66.     Consequently, the workers were issued old but clean clothes on-site, and were required to don and doff the clothes at the factory and shower on the premises before leaving in order to minimize health risks to themselves and others. *Id.* at 255. Under these circumstances, the Court had "no difficulty" concluding that these dress-related activities were compensable under the FLSA. *Id.*

67.     Following the Supreme Court's decision in *Steiner*, the Department of Labor ("DOL") issued regulations providing further guidance about the types of dress-related activities that are compensable under the FLSA. One such regulation, 29 C.F.R. § 790.8(c), describes "principal activity" as follows:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity.

68.     More recently, in an advisory memorandum regarding the Supreme Court's decision in *IBP v. Alvarez, 546 U.S. 21* (2005), the DOL reiterated its view that the FLSA requires compensation for donning and doffing safety gear when the donning and doffing activities must be performed at work. The DOL opined:

> Therefore, the time, no matter how minimal, that an employee is required to spend putting on and taking off gear on the employer's premises is compensable 'work' under the FLSA. … However, donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises.

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/field-assistance-bulletins/2006-2.*

69.     In light of the Supreme Court's opinion in *Steiner*, numerous circuit courts have endorsed the compensability of donning and doffing safety gear. For example, in *Tum v. Barber Foods, Inc.*, 360 F.3d 274, 278 (1st Cir. 2004), the First Circuit noted with approval the district court's opinion regarding the compensability of donning and doffing safety gear when wearing such gear is required by the employer and/or government regulation:

> The district court found that the donning and doffing of required gear is an integral and indispensable part of Employees' principal activities. *See generally Steiner v. Mitchell*, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956) (holding that activities should be considered integral and indispensable when they are part of the principal activities for the particular job tasks); *Mitchell v. King Packing Co.*, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956). We agree with the district court's conclusion as to the required gear. In the context of this case, Employees are required by Barber Foods and or government regulation to wear the gear. Therefore, these tasks are integral to the principal activity and therefore compensable. *See Alvarez v. IBP, Inc.*, 339 F.3d 894, 903 (9th Cir. 2003) (holding that donning and doffing which is both required by law and done for the benefit of employer is integral and indispensable part of the workday); *cf.* 29 C.F.R. § 1910.132(a).

*Id.*

70.     In *Franklin v. Kellogg Co.*, 619 F.3d 604 (6th Cir. 2010), the Sixth Circuit considered the issue of employee compensation for time spent donning and doffing food protective clothing and safety gear at the beginning and the end of work shifts. The protective gear at issue included hair and beard nets, safety glasses, ear plugs, and "bump caps." *Id.* at 608. The Sixth Circuit applied the *Steiner* test, asking whether the activities of donning and doffing were an "integral and indispensable" part of the principal activity of the employment. *Id.* at 619-20. The Sixth Circuit answered this question in the affirmative, reasoning that the activities were required by the manufacturer, and ensured untainted products and safe and sanitary working conditions. *Id.* at 620.

71.     In a case involving the donning and doffing of protective gear at a meat processing plant, *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005), the Ninth Circuit also applied the *Steiner* test. The court considered whether these activities of donning and doffing at

the beginning and end of a work shift were "integral and indispensable" to the principal activity of the employment, inquiring whether the activities were "necessary to the principal work performed and done for the benefit of the employer." *Id.* at 902-03. The Ninth Circuit concluded that the "integral and indispensable" test set forth in *Steiner* was satisfied with regard to the donning and doffing of all the protective gear at issue. *Id.* at 903.

**G.** **Employees' Walking and Meeting Time is Compensable Because it Occurs After the Beginning of their First Principal Activity and Before the End of their Last Principal Activity**

72.     The time spent by Plaintiffs and similarly situated employees walking to and from the locker room and the production area is compensable because it occurs after donning their PPE and before doffing their PPE.

73.     Similarly, the time spent by Plaintiffs and similarly situated employees engaging in face-to-face meetings prior to the start of their shifts is compensable because it occurs after donning their PPE and before doffing their PPE.

74.     On appeal to the Supreme Court, the employers in *Alvarez* did not challenge the Ninth Circuit's holding that, in light of *Steiner*, donning and doffing of protective equipment is compensable under the Portal Act. *Alvarez*, 546 U.S. at 32. Instead, the employers appealed a separate ruling regarding the compensability of walking time. *Id.* The Supreme Court held that walking time is compensable if it occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity. *Id.* at 37.

75.     In the wake of the Supreme Court's decision in *Alvarez*, the DOL issued an advisory memorandum stating, in pertinent part,

> The Supreme Court's unanimous decision in *Alvarez* holds that employees who work in meat and poultry processing plants must be paid for the time they spend walking between the place where they put on and take off protective equipment and the place where they process the meat or poultry. The Court determined that donning and

doffing gear is a "principal activity" under the Portal to Portal Act, 29 U.S.C. 254, and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a "continuous workday" and is compensable under the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq.

Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006), available at *https://www.dol.gov/whd/field-assistance-bulletins/2006-2* (footnote omitted)

## H.    Employees' Showering Activities are Compensable Because Showering is Required by the Nature of their Work and Significantly Reduces Health Risks

76.    Plaintiffs' and similarly situated employees' showering activities are also compensable because Defendant requires Plaintiffs and similarly situated employees to shower before leaving the facility in order to protect themselves and their families from the risks associated with the chemicals used at Defendant's plants.

77.    In *Alvarez, supra*, the Supreme Court endorsed the compensability of post-shift showering activities where, like here, the employees were exposed to dangerously caustic and toxic materials:

In 1955 … we were confronted with the question whether workers in a battery plant had a statutory right to compensation for the "time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health and hygiene, to change clothes and to shower in facilities which state law requires their employers to provide ...." *Steiner v. Mitchell*, 350 U.S. 247, 248, 76 S.Ct. 330, 100 L.Ed. 267 (1956). After distinguishing "changing clothes and showering under normal conditions" and stressing the important health and safety risks associated with the production of batteries, *Id.*, at 249, 76 S.Ct. 330, the Court endorsed the Court of Appeals conclusion that these activities were compensable under the FLSA.

*Alvarez*, 546 U.S. at 28. See also *Musch v. Domtar Industries, Inc.*, 587 F.3d 857, 859 (7th Cir. 2009) (Under the FLSA, an employee can be compensated for activities such as washing up or changing clothes if these activities are integral and indispensable to that employee's employment); *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, No. 08-C-0488, 2015 WL 1014612, at *3 (E.D. Wis. Mar. 9, 2015) ("The

16

standard is that the changing and showering is integral and indispensable if 'required by the nature of the work'—in other words, if 'changing clothes and showering at work will significantly reduce the risk to the health of the employee.'") (citation omitted).

I.     **Defendant's Regular Rate Violations**

78.     Defendant pays Plaintiffs and similarly situated employees a salary, plus shift premium pay, and mandatory overtime hours based on Defendant's established schedules.

79.     Under the FLSA, the "regular rate" at which an employee must be paid includes "**all remuneration** for employment paid to, or on behalf of, the employee," divided by hours worked in a workweek. 29 U.S.C. § 207(e) (emphasis added).

80.     Defendant violated the FLSA's overtime provisions, 29 U.S.C. § 207, by systematically failing to include all remuneration in Plaintiffs' and similarly situated employees' regular rates of pay when computing overtime pay.

81.     Consequently, Plaintiffs and similarly situated employees are paid at artificially low overtime rates.

J.     **Defendant Benefitted from the Unpaid Donning, Doffing, Walking, Meeting and Showering Activities**

82.     At all relevant times, Defendant directly benefited from the work performed by Plaintiffs and similarly situated employees in connection with the above-described pre-shift and post-shift donning, doffing, walking, meeting, and showering activities.

83.     At all relevant times, Defendant controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiffs and similarly situated employees.

84.     At all relevant times, Defendant was able to track the amount of time Plaintiffs and similarly situated employees spent in connection with the pre-shift and post-shift donning, doffing, walking, meeting, and showering activities. However, Defendant failed to do so and failed to pay

Plaintiffs and similarly situated employees for all of the work they performed.

85.     At all relevant times, Plaintiffs and similarly situated employees were non-exempt employees, subject to the requirements of the FLSA and state wage and hour law.

86.     At all relevant times, Defendant used its attendance and adherence policies against Plaintiffs and similarly situated employees in order to pressure them into performing the pre-shift and post-shift donning, doffing, walking, meeting, and showering activities without pay.

87.     Defendant expressly trained and instructed Plaintiffs and similarly situated employees to begin performing the above-described pre-shift donning, walking, and meeting activities *before* the start of their scheduled shifts, to ensure they were prepared to engage in their production and maintenance activities as soon as their shifts began.

88.     At all relevant times, Defendant's policies and practices deprived Plaintiffs and similarly situated employees of wages owed for the pre-shift and post-shift donning, doffing, walking, meeting, and showering activities they performed. Because Plaintiffs and similarly situated employees regularly worked 40 hours or more per week, Defendant's policies and practices also deprived them of overtime pay.

89.     Defendant knew or should have known that the time spent by Plaintiffs and similarly situated employees in connection with the pre-shift and post-shift donning, doffing, walking, meeting, and showering activities was compensable under the law. Indeed, in light of the explicit DOL guidance and Supreme Court case law cited above, there is no conceivable way for Defendant to establish that it acted in good faith.

90.     Also, upon information and belief, on multiple occasions employees of Defendant, including Plaintiff Decker, requested Defendant to pay them for the time spent in connection with the pre-shift and post-shift donning, doffing, walking, meeting and showering activities. Because of

this, there is no conceivable way for Defendant to establish that it acted in good faith.

91.     Despite knowing Plaintiffs and similarly situated employees performed work before and after their scheduled work shifts, Defendant failed to make any effort to stop or disallow the pre- and post- shift work and instead permitted it to happen.

92.     Unpaid wages related to the pre-shift and post-shift work described herein are owed to Plaintiffs and similarly situated employees at the FLSA mandated overtime premium of one and one-half times the regular hourly rates at which they were employed because Plaintiffs and similarly situated employees regularly worked 40 hours or more per week.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

93.     Plaintiffs bring this action 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> ***All current and former employees who worked for INEOS (or any of its wholly owned subsidiaries) at any of its Ashtabula facilities during the last three years and who were required to don and doff protective clothing or safety gear before the start of and after the end of their shifts***.

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this definition if necessary.

94.     Defendant is liable under the FLSA for, *inter alia,* failing to properly compensate Plaintiffs and other similarly situated employees.

95.     Excluded from the proposed FLSA Collective are Defendant's executives and administrative and professional employees, including computer professionals and outside salespersons.

96.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and the FLSA Collective were not paid premium overtime compensation when they worked over 40 hours in a workweek.

97.     Defendant assigned and/or was aware of all of the work that Plaintiffs and the FLSA Collective performed.

98.     As part of their regular business practices, Defendant intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This policy and practice includes, but is not limited to:

     a.  Willfully failing to pay employees, including Plaintiffs and the FLSA Collective, premium overtime wages for hours worked in excess of 40 hours per workweek; and

     b.  Willfully failing to record all of the time that employees, including Plaintiffs and the FLSA Collective, worked for the benefit of Defendant.

99.     Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek.

100.    Defendant's unlawful conduct has been widespread, repeated, and consistent.

101.    A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

102.    The employment relationships between Defendant and every proposed FLSA Collective member are the same. The key issues - the amount of uncompensated pre-shift and post-shift donning, doffing, walking, meeting and showering time - do not vary substantially among the proposed FLSA Collective members.

103.    Many similarly situated current and former employees have been underpaid in

violation of the FLSA and would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

104.    Court-supervised notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

105.    Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

106.    Plaintiffs estimate the proposed FLSA Collective, including both current and former employees over the relevant period, will be in excess of 100 workers. The precise number of FLSA Collective members should be readily ascertainable from a review of Defendant's personnel and payroll records.

## RULE 23 OHIO CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3) on their own behalf of:

> ***All current and former employees who worked for INEOS (or any of its wholly owned subsidiaries) at any of its Ashtabula facilities during the applicable statute of limitations period and who were required to don and doff protective clothing or safety gear before the start of and after the end of their shifts***.

(hereinafter referred to as the "Rule 23 Ohio Class"). Plaintiffs reserve the right to amend the putative class definition if necessary.

108.    The Rule 23 Ohio Class members are so numerous that joinder of all Rule 23 Ohio Class members in this case would be impractical. Plaintiffs reasonably estimate there are in excess of one hundred of Rule 23 Ohio Class members. Rule 23 Ohio Class members should be easy to identify from Defendant's computer systems and electronic payroll and personnel records.

109.    There is a well-defined community of interest among Rule 23 Ohio Class members and common questions of law and fact predominate in this action over any questions affecting

individual Rule 23 Ohio Class members. These common legal and factual questions include, but are not limited to, the following:

    a.   Whether the time Rule 23 Ohio Class members spent on pre-shift and post-shift donning, doffing, walking, meeting and showering activities is compensable time; and

    b.   Whether Rule 23 Ohio Class members are owed wages for time spent performing pre-shift and post-shift donning, doffing, walking, meeting and showering activities, and if so, the appropriate amount thereof.

110.    Plaintiffs' claims are typical of those of the Rule 23 Ohio Class in that they and all other Rule 23 Ohio Class members suffered damages as a direct and proximate result of Defendant's common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Ohio Class members' claims, and their legal theories are based on the same legal theories as all other Rule 23 Ohio Class members.

111.    Plaintiffs will fully and adequately protect the interests of the Rule 23 Ohio Class and have retained counsel who are qualified and experienced in the prosecution of class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Ohio Class.

112.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Ohio Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 Ohio Class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout Ohio.

113.    This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendant has advanced computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative

ease.

114.    Because the elements of Fed. R. Civ. P. 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

115.    Because Defendant acted and refused to act on grounds that apply generally to the Rule 23 Ohio Class and declaratory relief is appropriate in this case with respect to the Rule 23 Ohio Class as a whole, class certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.

**COUNT I**
**VIOLATION OF FLSA, 29 U.S.C. § 201 *et seq.***
**FAILURE TO PAY OVERTIME WAGES**

116.    Plaintiffs restate and reallege all previous paragraphs of the Complaint as if fully rewritten herein.

117.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

118.    At all times relevant to this action, Plaintiffs and the FLSA Collective were "employees" of Defendant within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

119.    Plaintiffs and the FLSA Collective, by virtue of their job duties and activities actually performed, are all non-exempt employees.

120.    Plaintiffs and the FLSA Collective either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

121. At all times relevant to this action, Defendant "suffered or permitted" Plaintiffs and the FLSA Collective to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

122. At all times relevant to this action, Defendant required Plaintiffs and the FLSA Collective to perform unpaid off-the-clock work in connection with their donning, doffing, walking, meeting and showering activities, but failed to pay these employees the federally mandated overtime compensation for the off-the-clock work.

123. The off-the-clock work performed every shift by Plaintiffs and the FLSA Collective is an essential part of their jobs, and these activities and the time associated with these activities are not *de minimis*.

124. In workweeks where Plaintiffs and the other FLSA Collective members worked over 40 hours, the unpaid off-the-clock work time, and all other overtime, should have been paid at the federally mandated rate of one and one-half times each employee's regular hourly wage, including shift differential pay, nondiscretionary incentive pay and all other non-excludable remuneration. 29 U.S.C. § 207.

125. Defendant's violations of the FLSA were knowing and willful. Defendant knew or could have determined how long it takes Plaintiffs and other FLSA Collective members to perform their off-the-clock work. Further, Defendant could have easily accounted for and properly paid Plaintiffs and the FLSA Collective for these work activities, but deliberately chose not to.

126. The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

<u>COUNT II</u>
<u>VIOLATIONS OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT</u>
<u>OHIO REV. CODE ANN. § 4111 *et seq.*</u>
<u>(On Behalf of the Rule 23 Ohio Class)</u>

127. Plaintiffs restate and reallege all previous paragraphs of the Complaint as if fully rewritten herein.

128. At all times relevant to this action, Defendant was an employer covered by the overtime and wages mandates of the Ohio Minimum Fair Wage Standards Act (the "Ohio Wage Act"), and Plaintiffs were employees entitled to the Ohio Wage Act's protections. *See* Ohio Rev. Code Ânn. § 4111.03.

129. The Ohio Wage Act entitles employees to compensation for every hour worked in a workweek. *See* Ohio Rev. Code Ann. § 4111.01.

130. The Ohio Wage Act entitles employees to overtime compensation at a rate equal to one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per week. *See* Ohio Rev. Code Ann. § 4111.03.

131. Defendant violated the Ohio Wage Act by regularly and repeatedly failing to pay Plaintiffs and similarly situated employees for the time spent on the off-the-clock work activities described in this Complaint.

132. As a result, Plaintiffs and similarly situated employees have and will continue to suffer losses of income and other damages.

133. Accordingly, Plaintiffs and other similarly situated Ohio Class employees are entitled to recover unpaid wages owed, plus costs and attorneys' fees, and other appropriate relief under the Ohio Wage Act at an amount to be proven at trial.

**COUNT III**
**VIOLATIONS OF THE OHIO PROMPT PAY ACT**
**OHIO REV. CODE ANN. § 4113.15**
**(On Behalf of the Rule 23 Ohio Class)**

134.    Plaintiffs restate and reallege all previous paragraphs of the Complaint as if fully rewritten herein.

135.    Ohio Rev. Code Ann. § 4113.15(A) requires that employers pay their employees on or before the first day of each month wages earned during the first half of the preceding month ending with the 15th day thereof and pay their employees on or before the 15th day of each month wages earned during the second half of the preceding month.

136.    Ohio Rev. Code Ann. § 4113.15(B) requires that where wages remain unpaid for 30 days beyond a regularly scheduled payday and no contest, court order, or dispute accounts for the non-payment, the employee is entitled to liquidated damages in the amount of 6% or $200.00 per violation, whichever is greater.

137.    No bona fide and legally cognizable dispute related to wages exists accounting for Defendant's failure to timely pay Plaintiffs.

138.    Accordingly, Plaintiffs and similarly situated Ohio Class employees are entitled to recover the amount of damages due and owing from Defendant under Ohio Rev. Code Ânn. § 4113.15(B).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the putative FLSA Collective and Rule 23 Classes, request judgment as follows:

a)      An order certifying this case as a collective action under 29 U.S.C. § 216(b) with respect to Plaintiff's FLSA claim (Count I);

b)      An order certifying this action as a class action (for the Rule 23 Ohio Class) under Fed. R. Civ. P. 23(b)(2) and (b)(3) with respect to Plaintiffs' Ohio state law claims (Counts

II-III);

c)    An order requiring Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, email addresses, phone numbers, and dates and location of employment of all FLSA Collective members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, apprising the FLSA Collective members of their rights by law to join and participate in this lawsuit;

d)    Designating Plaintiffs as the representatives of the FLSA Collective and the Rule 23 Ohio Class, and undersigned counsel as Class counsel for the same;

e)    Declaring Defendant violated the FLSA and the DOL's attendant regulations as cited herein;

f)    Declaring Defendant's violations of the FLSA were willful;

g)    Declaring Defendant violated the Ohio Wage Act and the Ohio Prompt Pay Act;

h)    Declaring Defendant's violations of the Ohio Wage Act and the Ohio Prompt Pay Act were willful;

i)    An entry of judgment in favor of Plaintiffs and against Defendant and awarding Plaintiffs and the FLSA Collective and the Rule 23 Classes the full amount of damages and liquidated damages available by law;

j)    Alternatively, in the unlikely event Plaintiffs cannot meet the requirements of Rule 23(b)(3), for an order certifying certain liability issues which exist, predominate, and are susceptible to class-wide proof;

k)    Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

l)    Awarding pre- and post- judgment interest to Plaintiffs on these damages; and

m)    Granting such further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all allowable claims and issues.

Date: June 27, 2023                Respectfully Submitted,

         */s/ Christina C. Spallina*
Robert J. Dubyak (0059869)
Christina C. Spallina (0088548)
**DUBYAK NELSON, LLC**
6105 Parkland Blvd, Suite 230
Mayfield Heights, OH 44124
PH: 216-364-0500 | FX: 216-364-0505
Email: rdubyak@dubyaknelson.com
       cspallina@dubyaknelson.com

*Attorneys for Plaintiffs and the Putative Collective/Class Members*